THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BOBBY EARL SIMS, Defendant-Appellant.

First District (3rd Division)   No. 77-1004

Opinion filed March 29, 1978.

Charles W. Nixon, of Brizius & Nixon, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The defendant, Bobby Earl Sims, in a jury trial was convicted of the offenses of murder and attempt in the murder and attempt armed robbery of James Williams. (Ill. Rev. Stat. 1973, ch. 38, pars. 9—1 and 8—4.) Judgments were entered on the verdicts and the defendant was sentenced to 25 to 50 years in the Illinois Department of Corrections for the offense of murder. On appeal, the defendant contends that the confession elicited from him should have been excluded from evidence as the fruit of an illegal arrest; that the confession should have been excluded since it was not preceded by proper *Miranda* warnings; and that his sentence was excessive.

On November 30, 1975, between 6:30 and 7 p.m., James Williams was shot and killed during a robbery attempt in the stairwell of a building at

1520 West Hastings in Chicago. Witnesses told police that there had been a scuffle between an older man and two young men in which they were trying to pull a valise or suitcase away from the older man. The witnesses observed a young man point a gun at the head of the victim. Based on interviews with witnesses on December 2, 1975, police arrested Terry Moore. As Moore was being transported to the police station, he told the officers to stop in front of Bobby Sims' house, saying that Sims was with him on the night of the murder. Police arrested Sims and took him to police headquarters where the defendant gave police a statement admitting his part in the crime.

At the hearing on the defendant's motion to suppress his confession as the fruit of an illegal arrest and as given without prior *Miranda* warnings, Investigators Bruce Peck and Leonard Sykes testified that they were Chicago Police Department homicide investigators and on December 2, 1975, were working on the homicide of Williams. Sykes testified that Moore's arrest was based on a police report which briefly described the age and height of three offenders allegedly involved in the shooting incident. Moore had been identified by name as one of the three by a witness who had told police on the night of the incident that he believed the group of young men, one of whom he recognized as Moore because they attended the same school, was going to rob his mother, but refrained when they saw the witness. Moments later, the witness and his mother heard shots downstairs in the hallway.

Sykes stated that after going to Moore's home and making the arrest on December 2, 1975, at approximately 6:45 a.m., Moore was placed in the squad car and advised of his rights. While in the car, Moore was told by Investigator Sykes that Sykes knew he was in the hallway at 1520 West Hastings prior to the shooting, and that police knew that there were two other young men present. Sykes told Moore he wanted Moore to tell him who the others were. Moore directed the officers to "Stop, right here," indicating the building at 1395 West Hastings, saying he was with Sims. Although Investigator Peck testified he also based the arrest on the descriptions in the police report, before arresting Sims the police officers did not have a physical description of him.

Sims was arrested at home at approximately 7:15 a.m. on December 2, 1975. Investigator Peck testified while in the car, Sims did not make any statement about the case, and did not say anything at all that he could recall. Sims was then taken to an interrogation room at headquarters where he was handcuffed to a metal ring set into the wall. Peck testified that after the defendant was taken to headquarters, he advised the defendant that he had the right to remain silent; that anything he said could and would be used against him in court; that he had the right to have an attorney and to have that attorney with him during questioning;

that if he could not afford an attorney, one would be provided for him by the State. The defendant acknowledged that he understood his rights. Both investigators testified that the defendant was never kicked, struck or hit by any police officer, nor was he promised anything in return for a statement regarding the incident. After being advised of his rights, the defendant was questioned very briefly, and admitted being in the hallway at 1520 West Hastings on the night of the murder. The officers then left Sims and questioned Moore in detail for 20-30 minutes. When they returned to the interrogation room, the defendant responded to questioning by Investigators Sykes and Peck and explained his part in the crime. The defendant was questioned again in the early afternoon, and later that night, around 11:30 p.m., made a statement recorded by a court reporter reiterating what he had recounted as his part in the incident.

Investigator William Frost testified that he was assigned to investigate the homicide of Williams, and on December 1, 1975, he gave a copy of the report he prepared to Investigators Sykes and Peck. He also relayed information he had received from witnesses. Pamela Price had told Frost that she had been in the stairwell at 1520 West Hastings and had seen a male subject pointing a gun at the head of an older man. She also gave a description of the man with the gun. Tammy Hampton told Frost that she had been in the stairwell and had observed a scuffle between an older man and two young men in which the young men were trying to pull a suitcase or valise away from the older man. These occurrences were observed at 6:30-6:40 p.m. on the evening of November 30, 1975. Frost also related that Willie Wright and Curtis Wright had spoken with police investigators regarding the incident. Willie Wright had seen two men loitering in the main lobby of the building, one of whom was known to his son, Curtis. Curtis Wright told police that he had entered a hallway of the building with his mother, and that a young man had stepped behind his mother, but upon seeing Wright, had backed off. Curtis Wright identified that man as Moore, whom he knew because they went to the same high school. Frost also testified that a brown leather valise had been found next to the body of the victim.

The defendant then took the stand to testify on the motion to suppress. Sims testified that it was approximately 6 a.m. on December 2, 1975, when Investigators Sykes and Peck came to his house. He was handcuffed and taken in a squad car to the police station. He stated that while being transported to the station, he was not advised of his rights, but was asked questions to which he did not respond. He was taken to a small room at the station and handcuffed to the wall.

The defendant further testified that Investigator Peck never informed him of his rights, although he had overheard Peck inform his mother of those rights at his house. He stated that Investigator Sykes questioned him

about the homicide, and that he had become frightened during this questioning when Sykes began beating on the desk with his fist. Sykes told the defendant that the minimum penalty for murder was five years, but that he might get probation because he had no prior record.

On cross-examination, the defendant acknowledged that he had heard Peck and Sykes testifiy that Peck had given him his *Miranda* warnings, but maintained that in fact he was never advised of his rights. Following arguments of counsel, the court denied the defendant's motion to suppress.

At trial, in addition to the testimony given by investigating officers and witnesses who had been at the scene around the time of the shooting, Tammy Hampton, who had given police information earlier which had led to Moore's arrest, and Lorraine Adams, both testified that they had identified the defendant in a lineup as one of the men who was in the stairway with the victim. In addition, the statement which the defendant had given to police was read to the jury. The statement, signed by the defendant, recited that he had been advised of his *Miranda* rights and that he understood each of those rights but chose to waive those rights and give the police his account of what had happened the night of the shooting. In his statement, the defendant admitted being at 1520 West Hastings with Moore and Delegent Taylor on November 30, 1975; that Moore gave him a .25-caliber automatic when Williams came into the hallway and that Taylor had a .38-caliber gun at the time; that Moore told him to rob a man and woman entering the building but that he did not; that he told Taylor he was not afraid to fire his gun; that when Williams entered the building, he said, "This is a stick-up," and Williams began backing up the stairs; that he gave his gun to Taylor when he started searching Williams' pockets, finding nothing; that Williams began to reach for his belt area and the defendant told his companions that Williams had a gun, whereupon Taylor shot Williams first with the .25 caliber automatic, and then with the .38-caliber revolver; and that all three of them ran out of the building.

The jury returned verdicts of guilty of attempt and of murder. The defendant appeals from the judgments entered upon those verdicts.

■■ The defendant first contends that his confession should have been suppressed as the fruit of an illegal arrest, arguing that police did not have probable cause for either the arrest of Moore or of the defendant. We disagree. Illinois law provides that a police officer may arrest a person without a warrant if he has "reasonable grounds" to believe that the person has committed or is committing an offense. Ill. Rev. Stat. 1975, ch. 38, par. 107—2(c).

" 'The test is not whether there is sufficient evidence to convict the

arrested person, but probable cause exists for arrest where a reasonable and prudent man, having the knowledge possessed by the officer at the time of the arrest, would believe the defendant committed the offense. (*People v. Hightower*, 20 Ill. 2d 361, 366.) In deciding the question in a particular case, courts deal with probabilities and are not disposed to be unduly technical. (*People v. Fiorito*, 19 Ill. 2d 246, 256.)' *People v. Jones*, 31 Ill. 2d 240, 243-4." *People v. Wright* (1968), 41 Ill. 2d 170, 174, 242 N.E.2d 180.

■■ In the case at bar, Sykes and Peck knew that Williams had been shot and killed at 1520 West Hastings on the evening of November 30, 1975. They had read the police report written by Frost and had spoken with him regarding further information he had concerning the incident. They knew there had been three young men in the hallway prior to the shooting, one of whom was identified as Moore. Two of the offenders, at least one of whom matched the description of one of the youths in the group of three with Moore, had been seen struggling to pull a suitcase or valise away from the victim. The information led to the arrest of Moore. After Moore was advised of his constitutional rights, Sykes told Moore that they had information which placed him at the scene of the crime prior to the shooting and that two others were with him. Moore then told the police that the defendant had been with him and directed them to Sims' residence. We are satisfied that the facts and circumstances presented to the officers warrant a reasonable man to believe that the defendant had been involved in the commission of an offense and that there was sufficient probable cause to arrest him. See *People v. Denham* (1968), 41 Ill. 2d 1, 5, 241 N.E.2d 415; *People v. McKee* (1968), 39 Ill. 2d 265, 235 N.E.2d 625.

The defendant also contends that his confession should have been suppressed since it was not preceded by proper warnings of his constitutional rights as prescribed in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. He also argues that the police gained a vital admission from him prior to the giving of any *Miranda* warnings.

■■ The evidence presented at the hearing on the defendant's motion to suppress established that Peck advised the defendant that he had the right to remain silent; that anything he said could and would be used against him in court; that he had the right to an attorney and to have that attorney with him during questioning; and, that if he could not afford an attorney, one would be provided for him by the State. The defendant urges that these warnings were defective because they did not inform him that he had the right to consult with an attorney. However, *Miranda* does not specify the precise language to be used in advising a defendant of his constitutional rights. It requires not a ritualistic recital of words but an

intelligent conveyance of the rights set forth in that decision. (*People v. Prim* (1972), 53 Ill. 2d 62, 67, 289 N.E.2d 601.) We think it is clear that the defendant was fully informed of his constitutional rights.

The defendant points to Sykes' nonresponsive answer to the question of whether he might not have asked Sims about being in the hallway at 1520 West Hastings prior to the time when the *Miranda* warnings were given in support of his argument that the police gained a vital admission before he was advised of his rights. However, the record does not sustain the defendant's contention. Both Sykes and Peck specifically testified that the defendant was given the *Miranda* warnings and acknowledged that he understood his rights before he was asked any questions. We must conclude that the statement was properly admitted into evidence.

■■ Finally, the defendant argues that his sentence was excessive and should be reduced. However, Illinois decisions have firmly established that the imposition of a sentence is a matter of judicial discretion, and absent abuse of that discretion, we will not disturb it on review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.) In light of the defendant's part in the brutal and unprovoked murder of James Williams, we do not believe that the sentence imposed upon the defendant was excessive.

The judgments of the circuit court of Cook County are affirmed.

Affirmed.

McNAMARA and SIMON, JJ., concur.